May it please the Court and Counsel, my name is Tom Kershaw. I am representing the Appellant Richard Yurizaga in this matter. This is a 1983 action with some pendent state law claims filed by a former prisoner in the county jail against the county jail officials and the county. I would frame the issue presented by this case as follows. Is there liability created by actions of state jail officials when they purposefully and in bad faith set out to not just ignore but to disregard and subvert a mandatory sentencing order and then do so by, in a capricious manner, materially altering the conditions of confinement as determining otherwise? I think Your Honor is referring, there was a hearing three days, well, there was a hearing three days after Mr. Yurizaga's release status was changed, which I describe in my brief, which he was not present at, didn't know about, which witnesses were prevented from appearing at. I think that may be the hearing Your Honor is referring to. Yeah, I didn't think it was quite that way. I thought that his attorney was there. That's correct. And the representation to the court was that they could go ahead in the absence of the defendant and then so the court did that. But you're Mr. Yurizaga didn't know anything about the hearing and it was conducted without his knowledge or consent. It was conducted without his knowledge. He didn't even know there had been a hearing until 21 days after he was, his release status was changed. And the hearing was created by another probation officer that they had a hearing in front of a different judge who didn't know anything about the case, as I said, at which he was not only not allowed to be present at, but there was considerable evidence that the probation officer and police officers who did understand the situation were prevented from being present. And you're saying that process, which otherwise might have been sufficient, even as you could kind of rock along with you saying, yes, he had a liberty interest in the furlough program as court created and he was taken off of the furlough program. Right. If he were given a hearing that satisfied due process, then he really wouldn't have anything to complain about, would he? That's correct. I mean, if he has a liberty interest, then he has due process. Right. And did he get due process becomes the question. I understand that. Well, first of all, I guess you'd better establish that you have a liberty interest. Well, I would like to talk about that. Questions about that, but while you're talking about the liberty interest. Go ahead. My understanding of a work furlough program is essentially you don't have to have one. It's something that a county decides whether they want one or not. When you're a sentencing judge, you can say you don't want someone to go to the work furlough, you know, say, like, if I give you a year in jail and you say, well, judge, go to the work furlough program. I said, no, I want you to be in jail or I don't want you on home detention. I don't want you on work release. I don't want you, I want you to have a year in jail as your punishment, that I can do that. Sure. And then, but let's just say, perhaps like your client, I say, well, you got a year in jail, I don't care if you want, go out to the work furlough program, you know, sign up and if they let you on it, that's fine with me. Right. My understanding is the Ninth Circuit has never said that there's a liberty interest in a work release program and that some of the other circuits have gone the other way. So I'd like, you know, I have concerns in terms of if you have a liberty interest in a work furlough program, then does that mean that now the sentencing judge would be violating your due process rights if you don't send them to that? Well, let's say a lot of these work furlough programs, I know people have to pay some money to be in them and then that opens the door for an individual to say, well, you know, I don't have money to pay the, you know, so I can't be on the work furlough program, but I have a liberty interest to do my sentence on the work furlough program. So, you know, now you're depriving me of that. I'm having a hard time seeing how you would have a liberty interest. Let me try and make some distinctions. Let me ask you one other one while you're thinking. I'll try and remember that question. But, you know, a judge sentences a defendant, say, to time in a county jail. All right. Now, the jailer can decide whether to put this person on work furlough or not. He's got the key, right? Some programs are like that. Some programs are like that. That's true. And if they want to, because it costs a lot of money to keep somebody in prison, if they don't think the person is dangerous, maybe they put them on work furlough. Maybe they have to pay a little bit while they're in there. So is that true? If a judge says, you must serve every day in the county jail and you can't have work furlough, will that stick? Sure. I think the judge has absolute authority to say that. Work release programs typically are discretionary with the sheriff or the jail. I don't think you can do that in the federal system. I mean, I think you just... Well, no. I mean, I think that a judge could say, you get no work release. I mean, they do it all the time. It happens all the time. They're always asking for work release. Gregerson is saying, and I think that there's some truth to this, if there's jail overcrowding, there are issues that the administrator of a jail sometimes has authority to let people out earlier or ease overcrowding and all of that. Well, that may happen, but that's really kind of nothing to do with this case. Well, they do it a lot. Sure. Typically, a work release program has discretion with the sheriff, and the judge says something like, you are eligible for the sheriff's work release program, and then you have to go through a process to see if the sheriff will allow you. This was not the case in this. It was absolutely not the case in this situation. The judge in this case said, this isn't work release. This is, I am sentencing you to spend certain hours in the jail and certain hours each day out of the jail. There was no discretion to the jail officials about this, none whatsoever. It was an order of the court. Right. And the judge. The whole point of the work release was, you're out when you're not, when you get to go out to go to work. And then the reason they modified it was because his work schedule changed. That's correct. They let you out enough time before to get to work and enough time after to get back to the jail. And in this case, that happened several times, and also there was a modification to allow the people to do, and this wasn't the only defendant, the only prisoner who was involved in this problem, but to allow them to eat because the jail was refusing to feed them, and to allow them to do laundry and personal things. But the point is, and the probation officer and the court's order made this very clear, it wasn't conditional upon anything. He was to be out during those hours, period. And that was what the jail didn't like, and there was a dispute between the jail and the judge, and the jail set out to just figure a way to subvert the court's order and to make my client and others' lives as miserable as possible in the process. And that's what occurred in this case. The liberty interest issue revolves around the Sandin case, and let me just refer to that. The Sandin case said that states may create liberty interest protected by the due process clause, and there are two things. First, while not exceeding the sentence that the judge imposed in such an unexpected manner as to give rise to the protection of the due process clause by its own force, and secondly, that does not impose an atypical and significant hardship in relation to normal prison life. So there's two things, and in this case what we have is an action on the jail's part which is clearly in contravention of the sentence that the judge imposed. And by the way, the action was also completely capricious. They just took the guy off his release status for no reason that had anything to do with what the court had ordered. And that, I believe, also violates substantive due process, which I'd love to talk about at great length, but my time is up. Thank you. If a person files a civil rights action in 1983 in Idaho against a public official, they have to put up a bond. If they lose, they have to pay the official's damages and attorney's fees. Is that right? Almost. What's right is that if you file a claim under state law against a public law enforcement official, you have to post a bond. I don't think that requirement applies to a civil rights action in federal court, but it does apply to any sort of claim for damages under state law. Okay. Well, you can bring a 1983 action in the state court. Yes, you could. That's true. Right? Sure. I mean, early on, when I was in law school, 1983 was given as an example of dead letter law. Here it's on the books. Since the Civil War, nobody pays attention to it. Then life was breathed into it in the whatever it was, 60s. Yeah, 60s. In the late 60s. And then some federal judges would say, well, you can't sue an L.A. police officer unless you first follow the administrative process in the state. You file a claim, and you go through all of that, and if it's rejected, then you come back here. Well, then the Ninth Circuit held that that was an impediment to the exercise of a federally protected right, and that requirement goes by the boards. Yeah, and I think this one has the same problem. Did you file a federal civil rights action here? Did I? Yeah. Did I? We actually filed it in state court, and it was removed. That's the procedural history of this. 1983. Mainly it is. There are some pendant state law claims as well. How do you do that if you know that you've got to put up a bond, and where's the prisoner going to get a bond? Who's going to bond him? Well, he's out by this time. But, I mean, obviously, I have the same question. I think it restricts access to the court and is an equal protection violation. Thank you, Your Honor. I appreciate the Court's time. May it please the Court. Counsel, my name is Curt Naylor. I represent the County and Sheriff Towsley. Let me just clarify about the bonding statute of all. Judge Pergerson, you commented on that. The bonding statute applies only to state law claims, negligence claim that was raised in this particular case when a law enforcement official has been sued. And that was, the legislative intent, was to preclude law enforcement officers from always fearing frivolous lawsuits being filed without some substance being established by bond. They don't fear it. The insurance companies fear it. And the statute provides that any bond can be filed. They could have filed a $5 bond as a prerequisite to filing a claim against Sheriff Towsley. And then only if the defendant objects to it or raises an issue, then it allows for the court to determine the sufficiency of the bond. But this issue, it's a prerequisite to filing a state law claim against a law enforcement official. And the Idaho Supreme Court has stated in the Pig case and Green-Wade as well as even more recently that the remedy is dismissal because it is a prerequisite. You can't cure it by simply filing a bond subsequently. It's the question. And that overcomes all the equal protection arguments and the constitutional arguments on this particular bonding statute that, again, only applies to the state law negligence cases. But I think that is a very important issue for this Court to address because in some cases in Federal court, the courts are not necessarily being consistent in following the statute that says that the case must be dismissed. That's the clear language of the law. Going back to the liberty interest issue, Judge Thompson, you've got a question. How does that impact this case? Was there a failure to post a bond? Yes, there was. Are you saying that then the case should have been dismissed? As to Sheriff Towsley individually, that does not save the county as an entity from the lawsuit. But wasn't the sheriff also sued under 1983? Yes, but that would not affect the 1983 claim as to the sheriff. Oh, okay. And the state law claim. Exactly, the supplemental jurisdiction. Just the negligence claim. Correct. As to the liberty interest, as the Court's pointed out, first there has to be a liberty interest. And since the Sandin case decided, most of the cases cited by plaintiff's counsel and appellant's counsel were pre-Sandin or addressed different issues. But I think the Sandin case is very clear that you look at whether the condition is atypical and creates an atypical and significant hardship on the prisoner. And in this particular case, then, what you're looking at, as Judge Coffner pointed out very appropriately, this man was incarcerated. There are other cases that deal with a person who has been released kind of on some special program or they're on parolee release, and so they can live outside the jail. But this, in this particular case, he was incarcerated. A jail sentence. Yes. Just how you do your jail sentence. Exactly. His probation had been revoked by Judge Edwards. And Judge Edwards, in his original decision, said, I don't grant work release. It creates problems for the sheriff. But he allowed for the probation officer to motion up for this furlough program or for him to be able to be released for work, which is exactly the reason that you had four amended motions and orders, was to allow him to work. Well, if you look at, in this particular case, then, what is typical for a person who is serving a sentence? It's to be in jail. Pardon me? It's to be in jail. Yes, that's typical. That's typical. Right. So to remove the opportunity for him to go home and fix lunch for his son and do his laundry at home, to remove that does not create an atypical and significant hardship upon him serving his incarcerated time. So at the very outset, you don't have a liberty interest that needs protection. That's an interesting way you phrase it, and that may be absolutely right. Well, Judge Koffner did it first, so I give him credit. You give him credit for it. But if you say that what the right is here is, or what the interest is, is the interest to work outside the prison walls, to go home and be with your son for part of the time, I guess. I don't know. Certainly to eat, maybe. If that is the interest, then that interest is atypical to confinement in jail, because you're not in jail. You're outside. You're doing this outside the jail. So it's atypical to confinement. Correct. But what you're saying is that confinement is typical and that the loss of this right simply results in the typical thing that a jail does, and that is confine you. I would compare it to the probation. Being on probation is a privilege. Yes. And once you get probation revoked, you're back to typical serving your time.  Confinement. Same thing. Now, does it make any difference that the court establishes this program of the court says you shall release him to go to work, rather than the jailer saying, well, I'm going to allow you to go to work? Does that make a difference? Well, it does. It would if there was no judicial overview of this. But in this particular case, you had the jailers who didn't find him at work. And there's some – it's a tangential red herring that they went to the wrong address for his home, because Judge Smyser, in revoking this work release and furlough, didn't address that. It was the question of whether he was at work. They told him they were going to go that day. And they told him. Exactly. Which they don't have to do. No. You're supposed to be at work when you're not in jail, right? And according to the stipulated facts, he said, come later, because then I'll be able to show you the whole plan. So he knew that they were on their way. Come at 10 o'clock? At night. Yeah, at 10 o'clock at night. Oh, I see. Because it was a later shift. They'd allowed him some additional time. I miss the people. So in other words, in this case, on Tuesday, they find the problem. On Wednesday, they tell the probation officer. She writes a letter telling the judge that the jail has revoked it. That's Tuesday. On Friday, Judge Smyser holds an emergency – well, an expedited hearing, allowing for Mr. Yerzog, his attorney, to present a motion to undo the revocation that the jailors had done. And stipulated on the record that he didn't need his client present because there were specific facts that were stipulated. I mean, he wasn't at work. Was the client served with a notice of revocation? Since he was represented by counsel, the law is clear that his counsel has binding authority to represent his interests. And since he represented on the record to Judge Smyser that he did have authority to act on behalf of his client, then his client was bound by his attorney's representation. Whether that was adequate representation by a criminal defense attorney is beyond this proceeding. I never had a situation come up where they just notify the attorney. They usually serve the defendant. Then the defendant gets his lawyer. Well, as I read the record, Judge Progerson, it appeared to me that his attorney, the public defender, had requested this expedited hearing, and the judge was giving him – I mean, it was Friday night. Because I think if you read at the very end, he says, now you can go off and have a good weekend. And it was late in the evening even. So I think his attorney requested the hearing and brought in the prosecutor. And so there may not have even been notice to the prosecutor to have the witnesses available, but they did. And once they had the stipulation of facts, there wasn't a need to have those witnesses there. On those work release programs, correct me if I'm wrong, but if, say, you go out to the job site and you don't find the person there, can't the sheriff just go out and get the person and take them back to jail and then worry about it later? I mean, don't you sign certain conditions? It's not a question of that you're supposed to be in jail. And if they decide at any point that they want you back in jail as opposed to out there, they can just go do it and bring you back to jail and then you worry about a hearing later. Exactly. And the record has a work release request signed by Mr. Urizaga that has those stipulations. And that's where this gets into, well, whether it was work release or was it this work furlough. And for that reason, the sheriff acted very reasonably. Just in conclusion, because claims counsel has pointed out, has used words like capricious, purposeful mistreatment, and there's nothing in the record to show that Sheriff Towsley individually, nor anyone else, purposely or maliciously had anything to do with, I mean, had that kind of motivation, which is necessary for an Eighth Amendment violation as to the medical sleep and meals. Even in that case, the plaintiff admitted on the record that he was not, he did not suffer any significant adverse effects from any of those claim deprivations. And those don't rise to the level of an Eighth Amendment violation as well. Subject to any other questions? Question that has not been answered. Do the prisons and jails in Idaho have law libraries? From my experience, they have available, they follow the Ninth Circuit ruling as far as having available legal resources is sufficient for what is necessary. It means what the Ninth Circuit has ordered, that they have either forms, paralegals, as well as books that are available. They don't have books, they have paralegals. Some of them do. Some are very small. The counties are very small, and they might have one cell, like, you know, Andy Mayberry. The state has paralegals. The state does. Yeah. Thank you, Your Honor. I think my time is up. Am I permitted? I'm not sure what the jailer is. I would just like to make one thing as clear as I can. There is typically a work release program, and there are forms and all that. But this case didn't involve that. This case involved a judge who was trying to give people work release, and the sheriff was ignoring him. And so the judge said, well, forget all that, then. I'm just going to issue an order. And the order says, without condition and without discretion, you will be, this prisoner will be out of jail during certain hours. And Mr. Urizaga did not violate that order in any way or shape or form. And there's no dispute about that. And the jail just went out there arbitrarily and said, my gosh, he's not at work this minute. We're just going to revoke it. Well, they had no authority to do that. They have to follow the order of the court. And that's what they did that was arbitrary. And so, you know, work release programs are much like Judge Callahan described. I mean, they are discretionary with the sheriff very often. And many of the cases you'll read in this area, you know, turn upon that fact. This was not that situation. It was a very unique situation because, as one of the witnesses said, the judge and the sheriff were button heads about this. And the sheriff was going to have his way. And by golly, he did, because Mr. Urizaga lost his job and his house. And that's exactly what the judge was trying to avoid. Thank you. All right. Playmakers versus ESP.
judges: Pregerson, Thompson, Callahan